
1    **PHILLIP J. TYDINGCO**
    ALTERNATE PUBLIC DEFENDERS OFFICE
2    Suite 902, Pacific News Building
    238 AFC Flores Street, Hagatña, Guam 96910
3    Tel: 475-3234 ✦ Fax 475-3238

4

5            IN THE UNITED STATES DISTRICT COURT

            FOR THE TERRITORY OF GUAM
6

7   UNITED STATES OF AMERICA,        )   CRIMINAL CASE NO. CR 01-00063
                                      )
8                     Plaintiff,     )
                                      )
9      vs.                               )
                                      )
10   MARIO F. MERCADER, EDITHA I. FULLER,   )   **DEFENDANT FULLER'S REPLY**
    RUPERTO A. ESPINOSA, JR., and        )   **TO UNITED STATES OPPOSITION**
11   LARRY VINCENT TOVES BLAS,        )   **TO MOTION TO DISMISS**
                                      )
12                 Defendants.   )
                                      )
13   ————————————————————— )

14

15                               **REPLY**

16        Defendant EDITHA I. FULLER hereby files the instant Reply respectfully disagreeing with

17 the assertions and arguments set forth by the United States in its Opposition.

18 **A. Lack of Due Diligence on the Part of the United States**

19        Defendant Fuller asserts that the United States in fact did not, as the Opposition states, take

20 every reasonable step to effect her capture in the Philippines. The Indictment against Defendant

21 Fuller was filed in July 2001. Although a request for Defendant Fuller's passport revocation was

22 sent from the United States Attorney's Office to the Department of Justice in September 2001, it is

    Defendant Fuller's position that this alone does not constitute due diligence on the part of the United

States in securing Defendant Fuller's return to the United States to face these charges.

As of 1996, there has been in force an extradition treaty between the United States and the Republic of the Philippines, which sets forth procedures for requesting extradition, as well as extraditable offenses.[1] The situation at hand would fall within the parameters of such treaty. However, the United States did not make efforts to utilize the extradition procedures, which are in place for this very situation. Rather, the Government opted for the arguably less expeditious route of informal comity – seeking the revocation of Defendant Fuller's U.S. passport and then the assistance and cooperation of certain Philippine government authorities or agents with her deportation. The United States failed to even *seek* extradition of Defendant Fuller under the treaty in force. The U.S. District Court of Michigan, in the case of <u>United States v. McDonald</u>, 172 F. Supp. 2d 941 (W.D. Michigan 2001), citing the Ninth Circuit case of <u>United States v. Hooker</u>, 607 F.2d 286, 289 (9th Cir. 1979), stated:

> Where the American right to demand extradition is established by treaty, considerations of foreign policy might well be subordinated to speedy trial...In this case, a foreign treaty was in place which allowed for the extradition and there were no considerations such as comity or the involvement of a foreign government official which required the exercise of significant foreign policy judgment...[E]ven in cases where the defendant is imprisoned in a foreign country which might elect to defer extradition, the failure to seek extradition is delay which is attributable to the government.

<u>McDonald</u>, <u>supra</u> at 948 (internal citations omitted).

In fact, it appears that Defendant Fuller's personal data was never entered into the NCIC by the U.S. Marshal's Service until March 8, 2004 – nearly three years after the Indictment and arrest

---

[1] See Attachment "A"; http://www.internationalextradition.com/phil_bi.htm and http://en.wikipedia.org/wiki/Extradition.

Page 2 of 4

1   warrant issued. See Attachment "B". Based on the Government's failure to take action under the

2   applicable treaty, which was in force at all relevant times, as well as its failure to expeditiously enter

3   Defendant Fuller's personal data in the NCIC, Defendant Fuller disputes the Government's statement

4   that it took every reasonable step to effect her capture. Defendant Fuller asserts that this

5   demonstrates a lack of due diligence on the part of the United States, and thus is a factor that weighs

6   against the Government in the instant motion.

7   **B.  The Delay in This Case is Presumptively Prejudicial**

8         Contrary to what the Government now argues, the period of delay at issue is from the time

9   of the Indictment to the time of the arrest – or over four years. The Government argues that only the

10   period between the Indictment and the time the United States authorities notified the Philippine

11   government – or roughly two months – should count against the United States in this Speedy Trial

12   scrutiny. However, based on the arguments set forth above regarding the lack of due diligence on

13   the part of the Government, Defendant Fuller asserts that the actual period to be considered is the

14   period between July 2001 and August 2005, which was the earliest point at which Defendant Fuller

15   could have been brought to trial.

16   **C. Defendant Fuller Did Not Waiver Her Right to a Speedy Trial**

17         The Government argues that Defendant Fuller willfully remained in the Philippines because

18   "she knew her confederates were getting arrested and the authorities were closing in on her," and

19   that her "failure to come forward constitutes a waiver of her Speedy Trial rights." United States

20   Opposition, p.6. In fact, there is no evidence that Defendant Fuller indeed knew of any pending

21   Indictment against her, nor is there any evidence that this was the reason for her remaining in the

22   Philippines. Defendant Fuller is a naturalized U.S. Citizen, but also a native of the Philippines. It

Page 3 of 4

1  cannot be assumed to the benefit of the Government that her decision to reside in the Philippines was

2  based on her desire to evade a pending Indictment and arrest warrant in the United States –

3  particularly where, as here, she had never been noticed of, and indeed had no knowledge of, the

4  Indictment or arrest warrant against her.

5      The Government cites <u>United States v. Aguirre</u>, 994 F.2d 1454 (9th Cir. 1993) to support its

6  argument. However, that case is distinguishable from the instant matter in that in the <u>Aguirre</u> case,

7  the defendant, who was in England, was advised of the criminal complaint against him. He returned

8  to the United States, but never contacted the authorities. He was eventually arrested five years later.

9  In that case, the Court found that the defendant knew of the charges and simply failed to answer to

10 them. This is not the situation here. Here, Defendant Fuller had no knowledge of the charges

11 against her. The Fifth Circuit held in <u>United States v. Bergfeld</u>, 280 F.3d 486 (5th Cir. 2002), that

12 a defendant's lack of knowledge of an indictment against him weighs exclusively in the defendant's

13 favor when analyzing a defendant's diligence in asserting his Speedy Trial rights. <u>Id.</u> at 489. Here

14 too, because Defendant Fuller did not know of the Indictment, she could not have made the request

15 for a speedy trial. Surely, she did not waive such right.

16      Defendant Fuller submits that the applicable period of delay between July 2001 and August

17 2005 is presumptively prejudicial, and as such, she need not demonstrate actual prejudice.

18      For the reasons stated above, Defendant Fuller's motion should be granted.

19      Respectfully submitted this 13th day of January, 2006.

20

21      By: _____
        **PHILLIP J. TYDINGCO**
22      Attorney for Defendant Fuller

Page 4 of 4



McNabb Associates, P.C.                                                          EXP

The FirmPractice AreasInterpolBlogsNewsroomDisclaimerContactLang

## BILATERAL EXTRADITION TREATIES

### PHILIPPINES

Jump directly to treaty

EXTRADITION TREATY WITH THE PHILIPPINES

TREATY DOC. 104-16

1994 U.S.T. LEXIS 185

November 13, 1994, Date-Signed

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

TRANSMITTING THE EXTRADITION TREATY BETWEEN THE
GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE
GOVERNMENT OF THE REPUBLIC OF THE PHILIPPINES,
SIGNED AT MANILA ON NOVEMBER 13, 1994.

TEXT:

104TH CONGRESS

1st Session

SENATE

LETTER OF TRANSMITTAL

THE WHITE HOUSE, September 5, 1995.

To the Senate of the United States:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of the Philippines, signed at Manila on November 13, 1994.

In addition, I transmit for the information of the Senate, the report of the Department of State with respect to the Treaty. As the report explains, the Treaty will not require implementing legislation.

Together with the Treaty Between the Government of the United States of America and the Government of the Republic of the Philippines on Mutual [*2] Legal Assistance in Criminal Matters, also signed November 13, 1994, this Treaty will, upon entry into force, enhance cooperation between the law enforcement communities of both countries. It will thereby make a significant contribution to international law enforcement efforts.

The provisions in this Treaty follow generally the form and content of extradition treaties recently concluded by the United States.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,

Washington, August 4, 1995.

The President,

The White House.

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty between the Government of the United States of America and the Government of the Republic of the Philippines (the "Treaty"), signed at Manila on November 13, 1994. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty follows generally the form and content of extradition treaties recently concluded by the United States. It represents part of a concerted effort by the Department of State and [*3] the Department of Justice to develop modern extradition relationships to enhance the United States' ability to prosecute serious offenders including, especially, narcotics traffickers and terrorists.

The Treaty marks a significant step in bilateral cooperation between the United States and the Philippines. Upon entry into force, it will become the first bilateral extradition treaty in effect between the United States and

the Philippines. (The United States signed an earlier extradition treaty with the Philippines on November 27, 1981. However, that treaty, which now is outmoded, was not forwarded to the Senate for advice and consent to ratification.) The Treaty can be implemented without legislation.

Article 1 obligates each Contracting Party to extradite to the other, pursuant to the provisions of the Treaty, any person charged with or convicted of an extraditable offense.

Article 2(1) defines an extraditable offense as one punishable under the laws of both Contracting Parties by deprivation of liberty for a period of more than one year, or by a more severe penalty. Use of such a "dual criminality" clause rather than a list of offenses covered by the Treaty obviates the need to renegotiate [*4] or supplement the Treaty as additional offenses become punishable under the laws of both Contracting Parties.

Article 2(2) defines an extraditable offense to include also an attempt or a conspiracy to commit, aiding or abetting, counselling, causing or procuring the commission of or being an accessory before or after the fact to an extraditable offense. For such crimes, the Treaty accommodates the differences between U.S. and Philippine criminal law (the Philippines, for example, has no general conspiracy statute) by creating an exception to the general dual-criminality requirement and permitting extradition if the crime is punishable under the laws of the Requesting State by deprivation of liberty for a period of more than one year, or by a more severe penalty, and the underlying offense is an extraditable offense.

Additional flexibility is provided by Article 2(3), which provides that an offense shall be considered an extraditable offense: whether or not the laws in the Contracting Parties place the offense within the same category of offenses or describe the offense by the same terminology; and whether or not the offense is one for which United States federal law requires the showing [*5] of such matters as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

With regard to offenses committed outside the territory of the Requesting State, Article 2(4) provides a basis for granting extradition if the Requested State's laws provide for punishment of an offense committed outside of its territory in similar circumstances or if the executive authority of the Requested State, in its discretion, decides to submit the case to its courts for the purpose of extradition.

Finally, article 2(5) provides that if extradition is granted for an extraditable offense, it shall also be granted for other offenses specified in the request that do not meet the minimum penalty requirement, provided that all other extradition requirements are met.

As is customary in extradition treaties, Article 3 incorporates a political

Case 1:01-cr-00063     Document 105     Filed 01/13/2006     Page 7 of 23

offense exception to the obligation to extradite. Article 3(1) states generally that extradition shall not be granted for political offenses. Article 3(2) specifies three categories of offenses that shall not be [*6] considered to be political offenses:

(a) a murder or other willful crime against the person of a Head of State of one of the Contracting Parties, or of a member of the Head of State's family;

(b) an offense for which both Contracting Parties are obliged pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for a decision as to prosecution; and

(c) a conspiracy or attempt to commit any of the offenses described above, or aiding and abetting a person who commits or attempts to commit such offenses.

The Treaty's political offense exception is substantially identical to that contained in several other modern extradition treaties, including the treaty with Jordan, which recently received Senate advice and consent. Offenses covered by Article 3(2)(b) include:

--aircraft hijacking covered by The Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague December 16, 1970, and entered into force October 14, 1971 (22 U.S.T. 1641; T.I.A.S. No. 7192);

--aircraft sabotage covered by the Montreal Convention for the Suppression of Unlawful Acts Against the Safety [*7] of Civil Aviation, done at Montreal September 23, 1971, and entered into force January 26, 1973, (24 U.S.T. 564; T.I.A.S. No. 7570);

--crimes against internationally protected persons, including diplomats, covered by the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, done at New York December 14, 1973, and entered into force February 20, 1977 (28 U.S.T. 1975; T.I.A.S. No. 8532);

--hostage-taking covered by the International Convention against the Taking of Hostages, done at New York December 17, 1979; entered into force June 3, 1983, and for the United States January 6, 1985 (T.I.A.S. No. 11081); and

--maritime terrorism covered by the Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, done at Rome March 10, 1988; entered into force March 1, 1992, and for the United States March 6, 1995.

Article 3(3) provides that extradition shall not be granted if the executive authority of the Requested State determines that the request was

politically motivated or that the offense is a military offense that is not punishable [*8] under non-military penal legislation (for example, desertion).

Article 4 bars extradition when the person sought has been tried and convicted or acquitted in the Requested State for the same offense, but does not bar extradition if the competent authorities in the Requested State have declined to prosecute or have decided to discontinue criminal proceedings against the person sought.

Under Article 5, when an offense for which surrender is sought is punishable by death under the laws of the Requesting State and the laws in the Requested State do not permit such punishment for that offense, the Requested State may refuse extradition unless the Requesting State provides such assurances as the Requested State considers sufficient that if the death is imposed, it will not be carried out. It further provides that if the Requesting State provides such an assurance, the death penalty, if imposed by the courts of the Requesting State, shall not be carried out.

Article 6 provides that extradition shall not be refused on the ground that the person sought is a citizen of the Requested State.

Article 7 establishes the procedures and describes the documents that are required to support an extradition [*9] request. The Article requires that all requests be submitted through the diplomatic channel.

Article 7(5) establishes the procedures under which documents submitted pursuant to this Article shall be received and admitted into evidence.

Article 8 provides that all documents submitted by either Contracting Party shall be in English, or shall be translated into English by the Requesting State.

Article 9 sets forth procedures for the provisional arrest and detention of a person sought pending presentation of the formal request for extradition. Article 9(4) provides that if the Requested State's executive authority has not received the request for extradition and supporting documentation within sixty days after the provisional arrest, the person may be discharged from custody. However, Article 9(5) provides explicitly that discharge from custody pursuant to Article 9(4) does not prejudice subsequent rearrest and extradition upon later delivery of the extradition request and supporting documents.

Article 10 specifies the procedures governing surrender and return of persons sought. It requires the Requested State to provide prompt notice to the Requesting State through the diplomatic channel [*10] regarding its extradition decision. If the request is denied in whole or in part, Article 10 also requires the Requesting State to provide information regarding the reasons therefor. If extradition is granted, the person sought must be removed from the territory of the Requested State within the time prescribed by the law of the Requested State.

Article 11 concerns temporary and deferred surrender. If a person whose extradition is sought is being prosecuted or is serving a sentence in the Requested State, that State may temporarily surrender the person to the Requesting State solely for the purpose of prosecution. Alternatively, the Requested State may postpone the extradition proceedings until its prosecution has been concluded and the sentence has been served.

Article 12 sets forth a non-exclusive list of factors to be considered by the Requested State in determining to which State to surrender a person sought by more than one State.

Article 13 sets forth the rule of speciality for this Treaty. It provides, subject to specific exceptions, that a person extradited under the Treaty may not be detained, tried, or punished for an offense other than that for which extradition has been [*11] granted, unless a waiver of the rule is granted by the executive authority of the Requested State. Similarly the Requesting State may not extradite such person to a third state for an offense committed prior to the original surrender unless the Requested State consents. These restrictions do not apply if the extradited person leaves the Requesting State after extradition and voluntarily returns to it or fails to leave the Requesting State within ten days of being free to do so.

Article 14 permits surrender to the Requesting State without further proceedings if the person sought provides written consent thereto.

Article 15 provides, to the extent permitted under the law of the Requested State, for the seizure and surrender to the Requesting State of property connected with the offense for which extradition is granted. Such property may be surrender even when extradition cannot be effected due to the death, disappearance, or escape of the person sought. Surrender of property may be deferred if it is needed as evidence in the Requested State and may be conditioned upon satisfactory assurances that it will be returned. Article 15 imposes an obligation to respect the rights of third parties [*12] in affected property.

Article 16 governs the transit through the territory of one Contracting Party of a person being surrendered to the other State by a third State.

Article 17 contains provisions on representation and expenses that are similar to those found in other modern extradition treaties. Specifically, the Requested State is required to bear expenses for the legal representation of the Requesting State in any proceedings arising out of a request for extradition. The Requesting State is required to bear the expenses related to the translation of documents and the transportation of the person surrendered. Article 17(3) clarifies that neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under the Treaty.

Article 18 states that the United States and Philippine Departments of

Justice may consult with each other directly in connection with the procession of individual cases and in furtherance of maintaining and improving Treaty implementation procedures.

Article 19, like the parallel provision in almost all recent United States extradition treaties, states that the Treaty shall apply [*13] to offenses committed before as well as after the date the Treaty enters into force.

Ratification and entry into force are addressed in Article 20. That Article provides that the Treaty shall be subject to ratification and that the instruments of ratification shall be exchanged as soon as possible, whereupon the Treaty shall enter into force.

Under Article 21, either Contracting Party may terminate the Treaty at any time upon written notice to the other party, with termination effective six months after the date of receipt of such notice.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate at an early date.

Respectfully submitted,

PETER TARNOFF.


EXTRADITION TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF THE PHILIPPINES

The Government of the United States of America and the Government of the [*14] Republic of the Philippines,

Desiring to provide for more effective cooperation between the Contracting Parties in the repression of crime; and

Desiring to conclude a Treaty for the reciprocal extradition of offenders;

Have agreed as follows:

Article 1

Obligation to Extradite

The Contracting Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting

State have charged with or convicted of an extraditable offense.

Article 2

Extraditable Offenses

1. An offense shall be an extraditable offense if it is punishable under the laws in both Contracting Parties by deprivation of liberty for a period of more than one year, or by a more severe penalty.

2. An offense shall also be an extraditable offense notwithstanding paragraph 1 of this Article if it consists of an attempt or a conspiracy to commit, aiding or abetting, counselling, causing or procuring the commission of or being an accessory before or after the fact to, any offense that is an extraditable offense pursuant to paragraph 1 and if it is punishable under the laws of the Requesting State by deprivation of liberty for a period of more than [*15] one year, or by a more severe penalty.

3. For the purposes of this Article, an offense shall be an extraditable offense:

(a) whether or not the laws in the Contracting Parties place the offense within the same category of offenses or describe the offense by the same terminology; or

(b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

4. If the offense was committed outside of the territory of the Requesting State, extradition shall be granted in accordance with the provisions of this Treaty:

(a) if the laws in the Requested State provide for punishment of an offense committed outside of its territory in similar circumstances; or

(b) if the executive authority of the Requested State, in its discretion, decides to submit the case to its courts for the purpose of extradition.

5. If extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in [*16] the request, even if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements of extradition are met.

Article 3

Political and Military Offenses

Case 1:01-cr-00063    Document 105    Filed 01/13/2006    Page 12 of 23

1. Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2. For the purposes of this Treaty, the following offenses shall not be considered to be political offenses:

(a) the murder or other willful crime against the person of a Head of State of one of the Contracting Parties, or a member of the Head of State's family;

(b) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution; and

(c) a conspiracy or attempt to commit any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses.

3. Extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated, or that the offense is a military offense which is not punishable under [*17] non-military penal legislation.

Article 4

Prior Prosecution

1. Extradition shall not be granted when the person sought has been tried and convicted or acquitted in the Requested State for the offense for which extradition is requested.

2. Extradition shall not be precluded by the fact that the competent authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested, or have decided to discontinue any criminal proceedings which have been initiated against the person sought for those acts.

Article 5

Capital Punishment

1. When the offense for which extradition is requested is punishable by death under the laws in the Requesting State, and the laws in the Requested State do not permit such punishment for that offense, extradition may be refused unless the Requesting State provides such assurances as the Requested State considers sufficient that if the death penalty is imposed, it will not be carried out.

2. In instances in which a Requesting State provides an assurance in accordance with paragraph 1 of this Article, the death penalty, if imposed

by the courts of the Requesting State, shall not be [*18] carried out.

Article 6

Extradition of Nationals

Extradition shall not be refused on the ground that the person sought is a citizen of the Requested State.

Article 7

Extradition Procedures and Required Documents

1. All requests for extradition shall be submitted through the diplomatic channel.

2. All requests for extradition shall be supported by:

(a) documents, statements, or other types of information which describe the identity and probable location of the person sought;

(b) a statement of the facts of the offense and the procedural history of the case;

(c) a statement of the provisions of the law describing the essential elements of the offense for which extradition is requested;

(d) a statement of the provisions of law describing the punishment for the offense;

(e) a statement of the provisions of the law describing any time limit on the prosecution or the execution of punishment for the offense; and

(f) the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.

3. In addition to the documents referred to in paragraph 2, a request for extradition of a person who is sought for prosecution [*19] shall be accompanied by such evidence as, according to the law of the Requested State, would provide probable cause for his arrest and committal for trial if the offense had been committed there and:

(a) a copy of the warrant or order of arrest issued by a judge or other competent authority; and

(b) a copy of the charging document.

4. A request for extradition relating to a person who has be convicted of the offense for which extradition is sought shall also be supported by:

(a) a copy of the judgment of conviction, or, if such copy is not available,

a statement by a judicial authority that the person has been convicted;

(b) information establishing that the person sought is the person to whom the conviction refers;

(c) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d) in the case of a person who has been convicted in absentia, the documents required in paragraph 3.

5. The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

(a) they are certified by the principal diplomatic or consular officer [*20] of the Requested State resident in the Requesting State; or

(b) they are certified or authenticated in any other manner accepted by the law of the Requested State.

Article 8

Language

All documents submitted by either Contracting Party shall be in the English language, or shall be translated into the English language, by the Requesting State.

Article 9

Provisional Arrest

1. In case of urgency, a Contracting Party may request the provisional arrest of the person sought pending presentation of the request for extradition. A request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Philippine Department of Justice.

2. The application for provisional arrest shall contain:

(a) a description of the person sought;

(b) the location of the person sought, if known;

(c) a brief statement of the facts of the case, including, if possible, the time and location of the offense;

(d) a description of the laws violated;

(e) a statement of the existence of a warrant of arrest or finding of guilt or

judgment of conviction against the person sought; and

(f) a statement that a request for extradition [*21] for the person sought will follow.

3. The Requesting State shall be notified without delay of the disposition of its application and the reasons for any denial.

4. A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required in Article 7.

5. The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 10

Decision and Surrender

1. The Requested State shall promptly notify the Requesting State through the diplomatic channel of its decision on the request for extradition.

2. If the request is denied in whole or in part, the Requested State shall provide information as to the reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3. If the request for extradition is granted, [*22] the authorities of the Contracting Parties shall agree on the time and place for the surrender of the person sought.

4. If the person sought is not removed from the territory of the Requested State within the time prescribed by the law of that State, that person may be discharged from custody, and the Requested State may subsequently refuse extradition for the same offense.

Article 11

Temporary and Deferred Surrender

1. If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the territory of the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by

Case 1:01-cr-00063    Document 105    Filed 01/13/2006    Page 16 of 23   1/13/2006

agreement between the Contracting Parties.

2. The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person [*23] sought has been concluded or until such person has served any sentence imposed.

Article 12

Requests For Extradition Made By More Than One State

If the Requested State receives requests from the other Contracting Party and from any other State or States for the extradition of the same person, either for the same offense or for a different offense, the executive authority of the Requested State shall determine to which State it will surrender the person. In making its decision, the Requested State shall consider all relevant factors, including but not limited to:

(a) whether the requests were made pursuant to treaty;

(b) the place where each offense was committed;

(c) the respective interests of the Requesting States;

(d) the gravity of the offenses;

(e) the nationality of the victim;

(f) the possibility of further extradition between the Requesting States; and

(g) the chronological order in which the requests were received from the Requesting States.

Article 13

Rule of Speciality

1. A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a) the offense for which extradition has been granted or a differently [*24] denominated offense based on the same facts on which extradition was granted provided such offense is extraditable or is a lesser included offense;

(b) an offense committed after the extradition of the person; or

(c) an offense for which the executive authority of the Requested State consents to the person's detention, trial, or punishment. For the purposes

of this subparagraph:

(i) the Requested State may require the submission of the documents called for in Article 7; and

(ii) the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request is being processed.

2. A person extradited under this Treaty may not be extradited to a third state for an offense committed prior to his surrender unless the surrendering State consents.

3. Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of that person to a third state, if:

(a) that person leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b) that person does not leave the territory of the Requesting State [*25] within 10 days of the day on which that person is free to do so.

Article 14

Voluntary Return

If the person sought consents in writing to surrender to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

Article 15

Seizure and Surrender of Property

1. To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all articles, documents, and evidence connected with the offense in respect of which extradition is granted. The items mentioned in this Article may be surrendered even when extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2. The Requested State may condition the surrender of the property upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such property if it is needed as evidence in the Requested State.

3. The rights of third parties in such property shall be duly respected.

Article 16

Transit

1. Either Contracting Party may authorize transportation [*26] through its territory of a person surrendered to the other State by a third State. A request for transit shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Philippine Department of Justice. It shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2. No authorization is required where one Contracting Party is transporting a person surrendered to it by a third State using air transportation and no landing is scheduled on the territory of the other Contracting Party. If an unscheduled landing occurs on the territory of one Contracting Party, that State may require that the other Contracting Party request transit as provided in paragraph 1. The Contracting Party in which the unscheduled landing occurs shall detain the person to be transported until the request for transit is received and the transit is effected, so long as the request is received within 96 hours of the unscheduled landing.

Article 17

Representation and Expenses

1. The Requested State shall advise, assist, appear [*27] in court on behalf of the Requesting State, and represent the interests of the Requesting State, in any proceedings arising out of a request for extradition.

2. The Requesting State shall bear the expenses related to the translation of documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3. Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under this Treaty.

Article 18

Consultation

The Department of Justice of the United States of America and the Department of Justice of the Republic of the Philippines may consult with each other directly in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

Article 19

Application

This Treaty shall apply to offenses encompassed by Article 2 committed before as well as after the date this Treaty enters into force.

Article 20

Ratification and Entry Into Force

1. This Treaty shall be subject to ratification; [*28] the instruments of ratification shall be exchanged at Manila as soon as possible.

2. This Treaty shall enter into force upon the exchange of the instruments of ratification.

Article 21

Termination

Either Contracting Party may terminate this Treaty at any time by giving written notice to the other Contracting Party, and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE in duplicate at Manila this thirteenth day of November, 1994.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

[ILLEGIBLE WORDS]

FOR THE GOVERNMENT OF THE REPUBLIC OF THE PHILIPPINES:

[ILLEGIBLE WORDS]

Back to top

©Copyright 2004 McNabb Associates, P.C. All Rights Reserved

**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

# PERSONAL HISTORY REPORT

| 1. File Title | 2. File Number | | 3. Program Code |
|---|---|---|---|
| MERCERDER, Mario F.    et.al. | RB-97-0004 | | |
| | 4. Group No. | 5. G-DEP ID | 6. Date Prepared |
| | 5 | XNA3I | 03-02-2004 |

| 7.  PURPOSE OF SUBMISSION: | ☐ G-DEP DESCRIPTION | ☐ ARREST | ☒ FUGITIVE DECLARATION |
|---|---|---|---|

| 8. Subject Name (Last, First, Middle) | 8a. Arrest No. | 9. Qualitative Characterization | 10. Date of Birth (MM-DD-YYYY) |
|---|---|---|---|
| FULLER, Edita Ilang | | AC | 06-06-1950 |
| 11a. Alias Name | | 11b. Priority Target | 12. Alternate Date of Birth |
| Editha FULLER | | ☐ YES   ☒ NO | |

| 13. NADDIS No. | 14. FBI No. | 15. Social Security No. | 16. Misc. Numbers (e.g., TECS; DRUG-X; Registrant; CSS No., etc.) |
|---|---|---|---|
| 4655555 | | 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 | |

| 17. Place of Birth (City, State/Country) | 18. Citizenship (Country) | 19. Alien Status   ☐ Illegal |
|---|---|---|
| Philippine Islands | United States | ☐ Legal (Alien Registration No.) |

| 20. Race | 21. Ethnicity | 22. Sex | 23. Color Hair | 24. Height |
|---|---|---|---|---|
| ☐ Black   ☒ Asian-Pacific Islander | ☐ Hispanic | ☐ Male | Black | 5' 04" |
| ☐ White | ☒ Non-Hispanic | | 25. Color Eyes | 26. Weight |
| ☐ Native American   ☐ Unknown | ☐ Unknown | ☒ Female | Brown | 150 lbs. |

| 27. Address (No., Street, Unit, City, State/Country, Zip Code) | 28. Identifying Characteristics (Scars, tattoos, marks, physical defects, etc.) |
|---|---|
| CURRENT: Unknown | |
| POSSIBLE: 760 East Pantaleon St. Hulo, Manila Philippine Isl. | |
| FORMERLY: 169 Redondo Catan, Dededo, Guam | |

| 29. Telephone Number (Include Area Code)    671-537-3271 |
|---|

| 30. Occupation | 31. Employer Name and Address |
|---|---|
| Unknown | N/A |
| | 32. Employer Telephone Number (Include Area Code) |

| 33. Passport No. | 34. Issue Date | 35. Issuing Country | 36. Expiration Date | 37. Name on Passport |
|---|---|---|---|---|
| 1203032908US | 04-07-1994 | United States | 04-06-2004 | FULLER, Edita Ilang |
| 38. Driver's License No. | | 39. Issuing State/Country | 40. Expiration Date | 41. Name on License |
| 1554518007 | | Guam | | FULLER, Edita I. |

| 42a. FAMILY INFORMATION (Last, First, Middle Name) | b. Age | c. Address (No. Street, Unit, City, State/Country) & Phone No. |
|---|---|---|
| Father | | |
| UNKNOWN | | |
| Mother | | |
| UNKNOWN | | |
| ☒ Spouse   ☐ Companion   ☐ Paramour | | |
| MERCERDER, Mario F. (FORMER HUSBAND) | | |
| Children | | |
| UNKNOWN | | |
| | | |
| | | |
| | | |
| Other Relatives                    (Relationship) | | |
| | | |

| 43a. Source of Supply (Name) | 44a. Criminal Associates (Use Remarks Section to Add Other Names) | 44b. NADDIS Nos. |
|---|---|---|
| UNKNOWN | MERCERDER, Mario F. | 4089593 |
| 43b. NADDIS No. | DEGUZMAN, Roland A. | 4665573 |

## I.  G-DEP DESCRIPTION (Complete for all G-DEP and Arrest Submissions.) Agents Manual 622

| 45. Submission: | 46. Subject's Principal Controlled Substance / |
|---|---|
| ☒ Initial | Commodity |

Use Letter-Number Code:    A3    EXHIBIT B

## I. ARREST *(Complete for all Arrest Submissions)*

| 47. Type of Arrest | 48. Date of Arrest | 49. PLACE OF ARREST | | |
|---|---|---|---|---|
| ☐ Probable Cause<br>☐ Warrant<br>☐ Fugitive | | a. City | b. County | c. State or Country |

| 50. Armed at Arrest | 51. If Armed *(Enter Number of Weapons by Type)* | | | | | | 52. Type of Violation Charged? (Possession, Sale, Conspiracy, etc.) |
|---|---|---|---|---|---|---|---|
| | TYPE | Handgun | Shotgun | Rifle | Lethal Cutting Instrument | Other Weapon | |
| ☐ Yes | Semi-Auto | | | | | | 53. Major Drug Charged? (Heroin, Cocaine, etc.) |
| ☐ No | Full Auto | | | | | | |
| | Other | | | | | | |

## III. FUGITIVE DECLARATION *(Complete if Defendant Not Arrested within 48 hours of the issuance of the Arrest Warrant.)*

| 54. Type of Declaration | 55. Apprehension Responsibility | 56. NCIC Number | 57. USMS Office Holding Warrant *(City & State)* |
|---|---|---|---|
| ☒ Original DEA Arrest Warrant<br><br>☐ Post Arraignment (Failure to Appear, Bond Default) | ☒ DEA<br>☒ USMS *(Date Delegated)*:<br><br>03 - 08 - 2004 | W183886789 | Hagatna, Guam |
| | | 58. Court Docket Number<br><br>CR-01-00063-002 | 59. Name of Judge or Magistrate<br><br>John S. Unpingco |

| 60. Date & Judicial District of Issue | 61. DEA Agent Contact *(Name and Phone Number with Area Code)* |
|---|---|
| June 28, 2001 District Court of Guam | Guam Resident Office TFO Scott G. Wade (671-472-7281) |

| 62 Type of Violation Charged *(possession, sale, etc.)* | 63. U.S. Code *(Title & Section)* | 64. Armed at Arrest | 65. Should be considered armed & dangerous |
|---|---|---|---|
| Conspiracy to Import | 21:963 | ☐ Yes ☒ No | ☐ Yes ☒ No |

66. Basis for Other Caution *(state basis)*

---

67. REMARKS

On June 28, 2001, a Federal Grand Jury in the District Court of Guam handed down a Federal Indictment against Edita Ilang FULLER aka. "Editha I. FULLER" and three co-conspirators. On June 28, 2001, the Honorable Judge John S. Unpingco issued a Federal Warrant of Arrest for Edita I. FULLER (filed under her alias Editha I. FULLER) and her three co-conspirators for the following offenses:

21:963 - Conspiracy to Import Methamphetamine Hydrochloride (Count 1)
21:846 - Conspiracy to Distribute Methamphetamine Hydrochloride (Count 2)
21:952 - Importation of Methamphetamine Hydrochloride (Count 3)
21:841(a)(1) - Distribution of Methamphetamine Hydrochloride (Count 5)

No current information has been obtained by the Guam Resident Office as to the whereabouts of fugitive FULLER. Old information indicates that FULLER maybe residing in the Philippines, or has relocated to the Mainland United States prior to being inputed into the NCIC system. FULLER's current whereabouts are unknown.

---

| 68. Agent/Officer Name *(Print or type)*<br><br>TFO Scott G. Wade | 69. Signature | 70. Date<br>3/10/04 |
|---|---|---|
| 71. Co-Agent/Officer Name *(Print or type)* | 72. Signature | 73. Date |
| 74. Supervisor *(Print or type)*<br><br>Jeffrey A. Silva | 75. Signature | 76. Date<br>3/10/04 |

Case 1:01-cr-00063    Document 105    Filed 01/13/2006    Page 23 of 23