

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 01-00063 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| EDITA FULLER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  Introduction

Edita Fuller[1] seeks to have the June 28, 2001 Indictment
charging her with conspiracy and other drug crimes dismissed
because she claims her Sixth Amendment right to a speedy trial
has been denied.  She makes her claim based upon the passage of
time, her lack of knowledge about the Indictment, and her
position that the United States government failed to invoke the
bilateral extradition treaty between the government of the United
States and the government of the Republic of the Philippines.
She faults the Government for claimed negligence in using the

---

[1] The defendant testified at a hearing held January 18, 2006
that her name is properly spelled "Edita".  The indictment
charges her as "Editha".  She will be referred to in this order
by her given name, not the charged name.

**ORIGINAL**

"comity" process of revoking her passport and its consequent dependence on Philippine law enforcement agencies to find and arrest her.

The United States resists the motion to dismiss the Indictment arguing that it was not negligent in pursuing the defendant, that once the revocation of her passport was invoked, progress was made or inhibited by uncontrollable dependance on the Philippine law enforcement agencies. The United States argues that it is not required by law to invoke extradition treaties of American citizens and this is particularly so when the suspect citizen's passport is revoked. Implied in the Government's position is the notion that Edita Fuller knew about the Indictment and arrest warrant, she was aware of the arrest of others with whom she had dealt, and that she secreted herself in the Philippines trying to avoid contact with former associates and with law enforcement.

The ostensible four-year delay between indictment and arrest in this case gives rise to "presumptive prejudice." Doggett vs United States, 505 U.S. 647, 652 fn.1 (1992). Even so, when the facts here are applied to the four-factor test articulated in Barker v Wingo, 407 U.S. 514 (1972) the Sixth Amendment right to a speedy trial has not been violated. The motion to dismiss the

Page -2

Indictment on constitutional speedy trial grounds is denied.[2]

## II.  Facts

Edita Fuller is one of the defendants in a long-term DEA investigation known as One-Pass. (US Brief pg 1). The essence of the conspiracy with which she is charged is that she and others paid couriers to transport illegal drugs into Guam by concealing the drugs in the seats and lavatories of commercial airliners. The "mules" would pick up the drugs in the Philippines and at some point in transit would secret the illegal matter on the plane.  Then persons in Guam who serviced the airplanes would remove the drugs as directed and the distribution would progress.

Sometime in 1998 the DEA and the Guam Customs people were sufficiently aware of the illegal activity that they began to intercept loads of "ice," or methamphetamine, on the planes. When they did this they would substitute sham drugs for the confiscated real thing.  The law enforcement agencies then started arresting the aircraft cleaning people.  They in turn pled guilty and began working undercover for the DEA.  By 1998, Mario Mercader, one of the co-defendants in Fuller's case and her former common law husband, left Guam and moved permanently to the Philippines. He allegedly continued to direct his drug operation

---

[2] No issue is raised based upon statutory speedy trial grounds. 18 U.S.C. § 3161.

Page -3

from there and has never returned or tried to return to Guam.

Fuller also left Guam and she too moved "home" to the Philippines. At the hearing on the motion to dismiss Edita Fuller testified that her last visit to Guam was in 1999 and that she has since lived in the Philippines, mostly at the same address she was at when the NBI "invited" her to come to the police headquarters in Manila.

There were others involved in the alleged conspiracy, one of them was Roland Mora. Mora was arrested in May, 1999. He too turned on his associates and agreed to make calls for the DEA. One call he made was to the cell phone of Edita Fuller in the Philippines, 63-918-875-7523. During the recorded conversation Mora asked Fuller when she would be coming back to Guam. She gave him a vague response indicating that her return would be "touch and go.". On May 3, 1999, Fuller told Mora that a load was coming to Guam the next day and that it would be hidden in seat 7-A. On May 4, 1999, one Richard Gonzales called Mora to advise that the drugs were in seat 6-A. DEA agents located four packages of ice hidden in seat 6-F. When they found the illicit drugs they substituted sham materials for them. When Mora told Gonzales that he had the drugs, the DEA arranged to have Mora deliver the phoney stuff to Gonzales at Ypao Park. Gonzales was arrested when he took delivery of the phoney drugs. The event coincidentally ended Fuller's contact with Mora.

Page -4

An independent investigation by the DEA discovered Cynthia Sulpacio was dealing drugs and this information led to the execution of a search warrant on her home May 14, 1999. Sulpacio confessed and spilled the beans on Fuller telling law enforcement that her source of illegal drugs was Edita Fuller with whom she had been dealing since 1997. Sulpacio revealed that during her early dealings with Fuller, when Fuller was still living on Guam, Fuller made periodic trips to the Philippines to get stashes of ice. According to Sulpacio, by January 1999, Fuller was living in the Philippines and had begun shipping ice to Sulpacio via courier.

A "Roland" delivered 12 packages to her in January 1999. Earlier in the day on May 14, 1999, the day Sulpacio's home was searched, Fuller had called her from the Philippines. Fuller wanted to know if anyone had called Sulpacio. That question was an agreed-upon signal that another load of ice was being shipped. On May 14, 1999, at the direction of the DEA, Sulpacio called Fuller on her cell phone at 63-918-875-7523 and told Fuller she had not been paged yet. Fuller said she was worried that "Stac" had been detained, that Fuller had called "Stac's" sister and was told Stac was "at detention." Sulpacio was never able to contact Fuller again after this conversation.[3]

---

[3]. The facts as set forth are based upon page 2 of the Government's brief in opposition to the motion to dismiss. At the January 18, 2006 hearing the parties stipulated that the

Page -5

At the evidentiary hearing on January 18, 2006, two witnesses testified: the resident U.S. DEA agent in the Philippines and Edita Fuller. Twenty-one exhibits for the government were admitted, and two[4] exhibits for the Defendant. Between the testimony and the exhibits the following facts were established:

1. On June 28, 2001 Judge John S. Unpingco issued a warrant for the arrest of Editha (sic) Fuller in conjunction with an indictment charging her with 1) Conspiracy to import methamphetamine hydrochloride; 2) Conspiracy to distribute methamphetamine hydrochloride; and 3) Importation of methamphetamine hydrochloride. (Ex 1).

2. A local newspaper article published in June of 2001 stated "arrest warrants were issued for four people [including Fuller] indicted for allegedly participating in a drug smuggling ring between 1995 and 1997. (Ex 2). While Editha (sic) Fuller was specifically named in the news article, she was not living on Guam at the time and there is no direct

---

facts set forth on page 2 of the Government's brief would be established by a witness present in the court room and ready to testify. The defendant, through counsel, stipulated that the witness would so testify if called.

[4]. The defendant did not offer Ex. "C", though it was discussed at the hearing.

Page -6

proof she ever read or heard about the news article.

3.  On September 5, 2001, Jeffrey L. Wendling, Country Attache for the DEA in the Philippines advised Philippine Chief Superintendent Reynor R. Gonzales of Editha (sic) Fuller's U.S. indictment and the nature of the crimes alleged in the indictment. The Philippine National Police (PNP) was asked to assist the DEA in locating and "later on" apprehending Fuller. The PNP was advised that Fuller's passport was canceled and that an "extradition request for MERCADER has been approved." Mercader was a co-defendant of Fuller, and her former common law husband. The PNP was advised that an Immigration Warrant against Fuller was not yet issued. Both Fuller and Mercader were naturalized United States citizens. Little explanation was provided at the January 18, 2006 hearing as to why the United States sought to extradite Mercader but did not seek to extradite Fuller. (Ex 4).

4.  On September 11, 2001 Mikel Schwab, AUSA forwarded the Indictments and arrest warrant for Fuller to Lee Cox, Office of International Affairs (OIA), indicating in a memo that Fuller and another were both US citizens in the Philippines. Schwab asked that Fuller's U.S. passport be revoked. The US

Page -7

Attorney's office in Guam was advised of this request. (Ex 3).

5. Between September 11, 2001 and August 2, 2002 there is nothing in the record to indicate there was any activity by the US Attorney, the DEA, or the PNP to locate Fuller, or to arrest her on the pending indictment. A facsimile of August 2, 2002 from the Department of Justice Criminal Division, Office of International Affairs responded to the Guam U.S. Attorney's office request for assistance in revoking Fuller's passport privileges. (Ex 5). No explanation was provided at the hearing as to why it took the Justice Department nearly one year to act on Schwab's request to revoke Fuller's passport. Given the September 11, 2001 date of Schwab's request, and the historical events of that day, it is not too difficult to draw inferences to explain part of the delay.

6. On August 2, 2002 the Office of International Affairs asked the Department of State to cable the U.S. Embassy in Manila concerning the request to deport Fuller and others. (Ex 6). The same day an unclassified cable was sent to the American Embassy in Manila seeking help in having Fuller returned to Guam. The cable, and earlier documents advised of Fuller's

Page -8

birth date and of her social security number and passport number. Fuller's alleged crimes were also detailed. The Embassy was "asked to approach the Philippine authorities and inform them that Fuller . . . [a] felon fugitives from U.S. Justice" and are "in the Philippines without a valid travel document. Their U.S. passports have been revoked, although they still may be in their possession. Also inform the Philippine authorities that because of the seriousness of the charges against Fuller..., the U.S. government would welcome their apprehension and detention, and any assistance Philippine authorities may be able to provide in their return to the United States." The cable suggested that if the Philippine government found the proposal acceptable, the U.S. "would request their assistance in detaining them for the brief time it will take to get U.S. Marshals to the Philippines..." (Ex 7).

7.    On August 19, 2002 another cable was sent from the Secretary of State in Washington D.C. to the American Embassy in the Philippines advising the Embassy of the revocation of Fuller's passport. (Ex 8).

8.    One day later Theodore Allegra, Counsel of the United States of America advised the Philippine Commissioner of the Bureau

Page -9

of Immigration and Deportation that Edita Fuller, "an American citizen and a federal fugitive" was believed to be living in the Philippines. He also advised that Fuller's passport had been revoked, and asked for help in apprehending and deporting Fuller to the U.S. The form letter sent by the Counsel intermixes gender pronouns referring to Fuller as "her" and "him" in the same sentence, and advising that "he" is the subject of a federal warrant. (Ex 8A). The same day a letter was prepared to send to Edita Fuller, August 20, 2002, informing her that her U.S. passport was revoked. The letter also advised of the pending federal charges and the arrest warrant. (Ex 10). There is no proof the letter was ever sent to Fuller. Fuller denied receiving the letter.

9. On August 27, 2002 Jeffery Wendling, the DEA Country Attaché in the Philippines sent a letter to the same commissioner giving background information on Fuller, including that the Philippine authorities had monitored "Fuller's activities in 1998". (Ex 9).

10. On October 8, 2002 DEA agent Mark Connell advised the Country Attaché Wendling that the DEA was making inquiries through local counterparts about Fuller's whereabouts. (Ex

Page -10

11).

11. Three months later on January 8, 2003 Agent Connell made the identical report to Country Attaché Wendling. (Ex 12). An unclassified cable dated January 31, 2003 was disseminated to various American Embassy's in the Pacific Rim countries. The cable detailed the background facts on the charges pending against Fuller, and the status of her passport revocation. The report also indicated contact with Fuller's relative and a request to them that Fuller be advised she had problems with immigration she needed to fix. (Ex 13).

12. On February 26, 2003 another unclassified memo was sent to the Pacific Rim Embassies detailing information that the Manila Country Office had located the residence frequently visited by Fuller. The cable indicates that Fuller "has been under protracted surveillance since August 2002." It also details that Fuller had her hair cut short and was spotted visiting a house on Pantaleon Street, Manduluyong City, Metro Manila in the early hours of the morning, and that her visit was very brief. The Philippine Bureau of Immigration had rented an apartment across from the residence to keep an eye on Fuller. (Ex 14).

Page -11

13. On May 27, 2003 Agent Connell made another identical report to those referred to in paragraphs 10 and 11 above. (Ex 15). The report was made on August 25, 2003. (Ex 16). Again on November 11, 2003 the another report was filed. (Ex 17).

14. There is a paucity of activity concerning Fuller, or the efforts to find her, between November 11, 2003, and the next report which is by Agent Rodel Babasa on January 6, 2005. Agent Babasa replaced Agent Connell in late 2004. His first report acknowledges the fugitive status of Fuller and her co-defendant, Mercader. (Ex 18). Agent Babasa contacted the DEA in Guam five months later to advise that the Philippine authorities had possibly located Fuller. Agent Babasa then asked if the Guam authorities had obtained provisional arrest warrants for Fuller and according to his memo the Guam DEA needed to ask the U.S. Attorney's office about the status of any arrest warrant for Fuller. (Ex 19). The only reference in the evidence produced, outside the agent's testimony, that concerned Provisional Arrest is Defendant's Exhibit A, ¶9. Exhibit A is the Extradition Treaty between the United States and the Republic of the Philippines. It provides as follows:

Article 9

Page -12

Provisional Arrest

1. In case of urgency, a Contracting Party may request the provisional arrest of the person sought pending presentation of the request for extradition. A request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Philippine Department of Justice.

15. On August 12, 2005 Agent Babasa reported to his superior that Fuller had been taken into custody on August 10, 2005 by the Philippine authorities. She was detained and Babasa was advised that Fuller had been arrested at her residence, 760 Pantaleon Street, Hulo Manduluyong, Metro Manila, Philippines. (Ex 20). When Agent Babasa met with Fuller he presented her with a letter from the U.S. State Department advising her that her passport had been revoked and that she would be transported to Guam.

16. During the period Fuller was in the Philippines, after she left Guam in 1999, a Bilateral Extradition Treaty between the Government of the United States and the Government of the Republic of the Philippines was in force and effect. (Def. Ex A). The extradition treaty applied to persons

Page -13

charged in either country with extraditable offenses, that is offenses that could result in incarceration of one year or more. (Def. Ex A, Article 2, ¶ 1). Article 6 of the treaty provides "Extradition shall not be refused on the ground that the person sought is a citizen of the Requested State."

17. A "Personal History Report" , including a "Fugitive Declaration" was prepared on March 2, 2004 concerning Edita Ilang Fuller. (Def Ex B). According to the testimony of Agent Babasa, there is no other information in the file that reflects the preparation or submission of such a report between June 28, 2001 and March 2, 2004.

## III.      Discussion

When pretrial delay gives rise to presumptive prejudice as it does here, the four-factor test of <u>Barker v Wingo</u>, 407 U.S. 514, 530 (1972) is applied to take measure of whether the Sixth Amendment speedy trial guarantee is violated.  <u>Doggett v United States</u>, 505 U.S. 647 (1992).  The <u>Barker</u> test requires inquiry into: (1) the length of delay between indictment and trial; (2) the reason for the delay; (3) the defendant's assertion of his right to speedy trial; and (4) prejudice to the defendant caused by the delay.  <u>U.S. v McDonald</u> 172 F.Supp. 2d 941, 946 (W.D.

Page -14

Mich. 2001). None of the factors alone is controlling, rather

they are to be analyzed and balanced. *See* Barker, 407 U.S. at

529-30. None of the cases cited by the parties in their briefs

provides authority arising from a naturalized United States

Citizen living in the country of birth and subject to extradition

treaty. The cases usually involve the citizen returning to the

United States where he or she lives openly and notoriously right

under the nose of law enforcement. Such is not the case here.


### A. *Length of Delay*

In this case the Government argues the delay is two months,

the period between the time of the indictment and notification of

Philippine authorities. (Gov't Brief, pg 5). The argument is

made in light of the concession that a delay as little as 13

months is presumptively prejudicial and triggers a Barker

inquiry. (Gov't Brief pg 5).

The defendant argues the delay is much longer, that is the

period between June 28, 2001 and August 10, 2005, when Fuller was

taken into custody by the Philippine authorities. The defendant

is correct on the length of delay. The chronological delay

exceeds four years. For speedy trial determinations the measure

of time is from indictment to trial. To hold otherwise would

create an limitless period for the Government to go about its

business. As the Government concedes, "[a] delay as little as 13

Page -15

months is presumptively prejudicial..." (Gov't Brief pg 5). A six-month delay is a borderline case. U.S. v Valentine, 783 F.2d 1413, 1417 (9th Cir. 1986). The delay in this case is significantly less than the eight and one-half year delay in Doggett and the fifteen-year delay in McDonald. Even so, the delay here means prejudice is presumed by the passage of time, though it can be overcome by consideration of other factors in the Barker test.

## B. *Reasons for the Delay*

The essence of the Government's position is that it was timely in seeking assistance from the Republic of the Philippines. It asserts that after the Indictment and the issuance of the arrest warrants on June 28, 2001, it started the process, and "[m]ore, the United States could not do." (Gov't Brief pg. 6). This argument belies the facts as set forth above.

Those facts reflect a significant amount of activity by the DEA, the Justice Department, and the State Department to corner Fuller and to have her arrested by the Philippine authorities. The record shows an effort to locate Fuller by surveillance, by periodic updating of contacts with the local authorities, by cable traffic passing on information and intelligence gathered concerning her. What is not explained is the significant delay between September 11, 2001 and August 2, 2002, nearly a year

Page -16

after a petition to Justice to help before any action was taken.
Again, there is no reasonable explanation as to why there is
virtually no activity between November of 2003 and January of
2005 when Agent Babasa assumed his duties. Nor is there any
reasonable explanation as to why the extradition treaty was not
invoked except for the idea that it would have "taken longer."
Paradoxically the extradition treaty was invoked in an effort to
find and arrest Mercader, Fuller's co-defendant and former
husband who was also a naturalized citizen of the United States.
Mercader is still at large, Fuller is in custody. Furthermore,
it appears that Agent Babasa utilized a significant provision of
the treaty when he first asked about, then obtained "provisional
arrest warrants". (Def. Ex. "A", Article 9). The legal problem
is whether the extradition treaty *must be invoked* if the passage
of time leading to presumptive prejudice is to be overcome.

It is the prosecutor and the court that have the
constitutional obligation to try the defendant in a timely
manner. United States v Brown, 169 F.3d 344, 349 (6th Cir.
1999). The measure of neglect discussed in Doggett involves
"reasonable" efforts to find a defendant on the lamb. Here Fuller
argues that the Ninth Circuit case of United States v Hooker, 607
F.2d 286 (9th Cir. 1979), and the Western District of Michigan
case of United States v McDonald 172 F. Supp.2d 941 (W.D. Mich.
2001)mean that if there is a formal extradition treaty, when the

Page -17

United States "sleeps on its rights" by not seeking extradition based on its provisions, the "delay in seeking the extradition is attributable only to the government regardless of the pendency of local criminal charges." McDonald 172 F.Supp.2d at 949. Both cases are distinguishable.

In Hooker the Circuit reversed the dismissal of an indictment that the Western District of Washington trial court had granted. Hooker was arrested in Peru for drug violations. Shortly after he was incarcerated the DEA interrogated him and told him if he cooperated the DEA would attempt to have him returned to the United States. Hooker balked and the government made no effort to return him. Later Hooker escaped and went to Ecuador. He was then returned to the United States to face trial. Nearly a year after his return Hooker moved to dismiss the indictment alleging that his right to a speedy trial had been denied because the government had failed to make a diligent good faith effort to obtain his release from Peruvian custody so he could be tried.

The Hooker court distinguished cited cases that involved defendants jailed in foreign countries when the government made no effort to obtain the accused for trial. Fuller was not jailed, and the United States immediately began the process of trying to find her in the Philippines and have her returned to Guam to stand trial. The reasonableness of the government's

Page -18

effort, and its good faith, begins with a realistic opportunity
to extradite a defendant whose location can be ascertained. Any
other rule creates a *de facto* violation of the speedy trial right
by the mere passage of time.

Both <u>Hooker</u> and <u>McDonald</u> rely on Judge Kaufman's Second
Circuit opinion in <u>United States v Salzman</u>, 548 F.2d 395 (2nd
Cir. 1976). Judge Kaufman wrote:

> "Where the American right to demand extradition is
> established by treaty, considerations of foreign policy
> *might well* be subordinated to speedy trial."

<u>United States v Salzman</u> 548 F.2d at 290. (Emphasis added). Before
extradition the defendant must first be in custody. The facts
for Fuller are that within days of her arrest by Philippine
authorities she was returned to Guam. The effort by the United
States to find her before she was in custody was reasonable,
diligent, and in good faith.

While it is true that case law holds the United States to
task if it sleeps on its formal extradition rights, that rule can
not be invoked unless and until the defendant is in the custody
of the foreign nation. *See*, <u>United States v McDonald</u> at 949. It
is to no avail for Fuller to argue that the extradition treaty
with the Republic of the Philippines should have been invoked if
she was not in custody and the facts here do not establish that
the United States slept on its extradition rights. What was done

Page -19

was reasonable and that is the standard against which the reason for delay is measured.

In balancing the facts here, there is a delay of two years for which the Government has provided no explanation to justify the reason for the delay. Undoubtedly the extradition treaty could have been invoked. Whether it would have made a difference only goes to the question of reasonable choices in trying to arrest Fuller and bring her to trial in Guam.

The question then becomes whether a delay of two years attributable to the neglect of the Government would tip the scale of dismissal in favor of Fuller. It does not. Many cases take up to two years between indictment and trial. While the chronological period of delay is four years, in my view only two of those four years work in favor of Fuller. Fuller's testimony established that she was aware of the arrests and prosecution of three associates with whom she had dealings, including recorded telephone conversations. That is proof from which a reasonable inference can be drawn: Fuller knew she was targeted and took steps to avoid apprehension. She cut her hair, moved in the early morning hours, did not stay constantly at the same place, and she terminated any telephone contact or "shipments" with those former associates she must have suspected had been nailed by the DEA.

Page -20

## C. *Timely Assertion of Right to Speedy Trial*

Fuller timely asserted her right to a speedy trial. But, the balance of other factors mitigates against finding a speedy trial violation. Arguably she was aware of the charges, a premise based only on inference, but she testified she only became aware of the Indictment when she was apprehended and returned to Guam for her initial appearance in August of 2005. It is implausible that Fuller would assert her speedy trial rights if she was not aware of the indictment. There is no duty for the defendant to bring herself to trial. <u>Barker</u> 407 U.S. at 527. "Once the accused has been indicted, the government has a constitutional duty to make a diligent, good faith effort to locate, apprehend and bring [a defendant] to trial." <u>United States v Shell</u>, 961 F.2d 138,144 (9th Cir. 19920. Under the circumstances Fuller's failure to assert her Sixth Amendment speedy trial right before her arrest should not be weighed against her. After her arrest she made a timely demand to dismiss the charges because she had not been given a speedy trial.

## D. *Prejudice*

Whether Fuller has been prejudiced is the final consideration, and in light of the other factors it is the one that tips the scale against her. With presumed prejudice <u>Doggett</u> altered the fourth factor of <u>Barker</u> to the extent that the

Page -21

government would have to "persuasively" rebut the presumptive prejudice. <u>Barker</u>, 505 U.S. at 658.

Traditionally prejudice is measured by oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that a defense will be impaired. <u>Doggett</u>, 505 U.S. at 654. There has been no oppressive pretrial incarceration of Fuller. Any anxiety she may have experienced could only have been based on her knowledge that her cohorts had been arrested and that it was likely she was part of the investigation too. On the other hand, if she was unaware of the Indictment she could not have experienced anxiety or concern due to the lack of a resolution of the pending federal charges.

It is the final factor that I believe has been persuasively rebutted by the evidence and arguments in this case. Fuller testified that she was aware of multiple tape recorded conversations between her and some of the government's principle witnesses. Those transcripts of what happened are available to her. The U.S. Attorney represents that all witnesses involved are available to testify and that discovery concerning statements each has made are available to Fuller and her counsel.

Furthermore, if the allegations of the Indictment are true, the scheme involved in the conspiracy was sophisticated and could not have been carried off without significant planning, logistics, and accounting. It is unlikely that a person involved

Page -22

in such a notorious operation would be forgetful of important details that might afford a defense, or that would provide her counsel with ammunition for cross examination. Because of the tape recorded conversations, the availability of witnesses, it is unlikely that any alibi defense exists or would be asserted. If Fuller was not involved, and was with her family in Manila as she testified, she has the opportunity to present that proof about her activities during the period in question. Her phone records, and the records of others, will tell the tale of involvement with convicted witnesses. In my view the Government has persuasively overcome any presumed prejudice.

This case is different than the companion case of <u>U.S. v Roland DeGuzman</u>, Cr. No. 00-00052 where Judge James Otero, sitting in Guam, granted DeGuzman's motion to dismiss on speedy trial grounds. DeGuzman cooperated with the DEA, was offered a plea agreement, refused it and left Guam. When he left he gave the DEA contact information and obtained work with Continental Airlines in New Jersey. The government had all this information, and DeGuzman lived and worked under his own name at the place and business he had given to the DEA. The delay was shorter than the delay here but there was clear active negligence attributed to the government. For the reasons stated above Fuller's claim can be distinguished.

Page -23

## IV. Conclusion

In my view the Government has overcome the presumptive prejudice caused by the two year delay attributable to it in the four-year period between Fuller's indictment and her arrest. There is no prejudice to her based upon the record here. Investigators were actively monitoring the investigation of the PNP in its effort to find Fuller. While the extradition treaty was not formally invoked, neither was she in custody. The means of investigation, and effort to find Fuller, was reasonable and diligent. When balanced against the likelihood of prejudice to Fuller, the presumption of prejudice has been overcome.

Therefore, IT IS ORDERED that Defendant's motion to dismiss based upon a claim that she was denied her right to a speedy trial is DENIED.

DATED this _____ day of January, 2006.

_____
Donald W. Molloy, Chief Judge
United States District Court

Page -24